[No. B233759. Second Dist., Div. Seven. Feb. 15, 2012.]

KAISER FOUNDATION HEALTH PLAN, INC., et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent. ANNA RAHM et al., Real Parties in Interest.

[redacted]

## COUNSEL

Arnold & Porter, Lawrence A. Cox, Brian K. Condon; Taylor Blessey, N. Denise Taylor and Jennifer A. Scher for Petitioners.

Cole Pedroza, Curtis A. Cole and Cassidy E. Cole for California Medical Association, California Hospital Association and California Dental Association as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Shernoff Bidart Echeverria, Michael J. Bidart, Ricardo Echeverria, Steven Schuetze; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Real Parties in Interest.

## OPINION

**ZELON, J.—**

### INTRODUCTION

Anna Rahm and her parents, Lynnette and James Rahm, filed a complaint against Kaiser Foundation Health Plan, Inc., and two Kaiser health care

providers. The complaint alleged that defendants had devised an insurance compensation scheme that induced Kaiser's physicians to deny costly medical services to plan members. Plaintiffs asserted that, as a result of the scheme, Kaiser's health care providers had improperly delayed an MRI for Anna, resulting in significant injuries. The complaint included four causes of action against each defendant and sought punitive damages for breach of the implied covenant of good faith and fair dealing and intentional infliction of emotional distress.

Defendants filed a motion to strike the punitive damages allegations arguing that plaintiffs had failed to comply with the requirements of Code of Civil Procedure section 425.13, subdivision (a). The trial court ruled that statute did not apply to plaintiffs' punitive damages claims and denied the motion.

Defendants filed a petition for writ of mandate seeking an order directing the superior court to grant the motion to strike. We summarily denied the petition and defendants filed a petition for review in the California Supreme Court. While defendants' petition for review was pending, plaintiffs dismissed their punitive damages claims against the Kaiser health care providers. The Supreme Court granted review and directed this court to issue an order to show cause; this court issued that order on August 25, 2011.

We now conclude that plaintiffs were not required to comply with Code of Civil Procedure section 425.13 (section 425.13) because (1) the statute does not apply to plaintiffs' claims against Kaiser Foundation Health Plan and (2) plaintiffs have dismissed their punitive damages claims against the health care provider defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Summary of Facts Preceding Plaintiffs' Lawsuit[1]

Anna Rahm is a member of the Kaiser Permanente Traditional Plan (the plan), which provides its members medically necessary health care in exchange for monthly premiums. In August of 2008, Anna began experiencing back pain. Anna's parents, Lynnette and James Rahm, took Anna to a

---

[1] This factual summary is based on allegations in plaintiffs' complaint, which we assume to be true for the purposes of reviewing the trial court's order denying defendants' motion to strike. (See *Turman v. Turning Point of Central California, Inc.* (2010) 191 Cal.App.4th 53, 63 [119 Cal.Rptr.3d 166] (*Turman*) [" 'In passing on the correctness of a ruling on a motion to strike [punitive damages allegations], judges read allegations of a pleading subject to a motion to strike as a whole, all parts in their context, and assume their truth.' [Citation.]"].)

chiropractor. After the treatments failed to alleviate Anna's pain, the chiropractor recommended that Anna "consult with a medical doctor because she was in need of an MRI."

In March of 2009, Anna met with Charlene Huang, a primary care physician at Kaiser. Lynnette accompanied Anna to the appointment and requested that her daughter receive an MRI. Although Huang acknowledged that Anna's chiropractor had determined that her back pain was " 'severe,' " Huang refused to order an MRI. Huang referred Anna "to the physical medicine department at [Kaiser] and also prescribed pain medications and steroids, a much less expensive treatment than an MRI." Anna took the prescribed medications but her pain persisted.

Two weeks later, on March 24, 2009, Anna met with Ngan Vuong, a physical medicine doctor at Kaiser. Lynnette accompanied Anna to the appointment and again requested that Anna receive an MRI. Vuong, however, recommended that Anna receive an epidural and suggested that her pain could be remedied through changes to her nutrition and exercise habits. Lynnette told Vuong she did not want her daughter to receive an epidural and renewed her request for an MRI. Vuong refused to authorize an MRI.

In April of 2009, Anna sought acupuncture treatment for her pain. The treatments were unsuccessful and the acupuncturist recommended that Anna request an MRI from her doctor. Lynnette called Vuong and informed her that Anna's acupuncturist had recommended an MRI. Vuong again declined an MRI and referred Anna to Kaiser's physical therapy department.

In May and June of 2009, Anna continued her acupuncture treatments. Two different acupuncturists concluded that Anna was in need of an MRI. Anna also attended several physical therapy sessions at Kaiser, but was forced to discontinue the treatments because they were too painful. Kaiser's physical therapy department "recommended that [Anna] receive an MRI."

Lynette called Vuong again and explained that a chiropractor, two acupuncturists and Kaiser's physical therapy department had all recommended an MRI. Vuong rejected these recommendations because they were not made by medical doctors, but invited the Rahms to seek a second opinion.

Lynnette elected to schedule a meeting with another doctor. Prior to the appointment, Lynnette contacted Huang, Anna's primary care physician, "as a last ditch effort" to get an MRI. Lynnette summarized the treatments Anna had undergone since her initial visit with Huang. Huang finally agreed to authorize an MRI, which was performed on July 2, 2009.

Anna's MRI indicated that she had an "aggressive mass" in her pelvis. A biopsy revealed that Anna was suffering from a "high grade" osteosarcoma,

which is "one of the fastest growing types of osteosarcoma, meaning that [Kaiser's] three month delay in ordering [Anna's] MRI allowed the cancer to spread and ultimately substantially contributed to [Anna's] poor prognosis." Anna underwent chemotherapy and had numerous surgeries that resulted in the loss of her right leg and portions of her pelvis and spine.

### B. *Plaintiffs' Complaint*

On July 15, 2010, Anna and her parents filed a complaint against Kaiser Foundation Health Plan (Kaiser Health Plan or Health Plan), which administered Anna's health care plan. The complaint also named Kaiser Foundation Hospitals (Kaiser Hospitals) and Southern California Permanente Medical Group (SCPMG), which contract with Kaiser Health Plan to provide hospital and medical services to the plan's insureds. The complaint asserted four causes of action against each defendant: (1) breach of the implied covenant of good faith and fair dealing; (2) breach of contract; (3) negligent infliction of emotional distress; and (4) intentional infliction of emotional distress.

Plaintiffs alleged that defendants, who were collectively referred to as "KAISER," had devised "a system of withholding benefits from insureds which necessarily results in KAISER unreasonably depriving its insureds the benefits of their contracts with KAISER. This system is one where KAISER has bestowed upon its contracted physicians the responsibility of determining whether or not to give insureds benefits under their contracts. Underlying this system is a cost saving component: each determination a KAISER physician makes must be based, in part, upon the cost to KAISER of the treatment or care requested. [¶] . . . [T]his system, with a heavy emphasis on cost saving to KAISER, results in pressures on KAISER's physicians that removes [*sic*] the physicians' abilities to give medical care which is in the patient's best interests. This system also results in little or no investigation by KAISER as to whether a patient is in need of certain medical care and/or treatment. This system is concealed from KAISER's insureds and ultimately causes them harm."

The complaint further alleged that Kaiser's "physicians are rewarded for adhering to the cost saving system that KAISER has put into place. Specifically, that the physicians receive bonuses which are dependent upon the cost savings realized by KAISER due to the physicians['] withholding of treatment and/or care of the insureds."

In describing their individual causes of action, plaintiffs alleged that defendants had breached the implied covenant of good faith and fair dealing by (1) "unreasonably denying and delaying care and treatment to Anna that was covered under [the plan]"; (2) "unreasonably avoiding incurring expenses

for diagnostic testing for its own financial gain by ignoring the seriousness of Anna's medical condition and needs"; (3) "placing its own financial interests ahead of Anna's health care"; and (4) "unreasonably engaging in a pattern and practice of failing to conduct a thorough, fair and balanced investigation in evaluating requests for benefits and/or services for its members under [the plan]."

Plaintiffs' claim for intentional infliction of emotional distress alleged that the defendants "refus[ed] to grant [Anna's] requests for diagnostic testing, even though defendants knew, or should have known, that the medically necessary diagnostic testing was covered under the [plan]. Defendants knew, or should have known, that their refusal to approve diagnostic testing for [Anna] caused [Anna, Lynnette and James] to be fearful and extremely worried about [Anna's] condition." The complaint further asserted that defendants "intentionally . . . and unfairly refused to provide [Anna] with the requested, medically necessary care," thereby causing Lynnette, James and Anna to "suffer[] fear, depression, humiliation, and severe mental anguish and emotional and physical distress."

Plaintiffs' claims for breach of the implied covenant and intentional infliction of emotional distress each included an allegation asserting that defendants' misconduct "constitute[d] malice, oppression or fraud under California Civil Code section 3294, thereby entitling plaintiffs to punitive damages in an amount appropriate to punish or set an example of defendants."

## C.  *Defendants' Motion to Strike*

On January 7, 2010, defendants filed a motion to strike the punitive damages allegations. Defendants argued that plaintiffs had failed to comply with section 425.13, subdivision (a) which states: "In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed." The section further provides that the trial court may allow an amended pleading claiming punitive damages only if the plaintiff submits evidence establishing "that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code." (*Ibid.*)

Defendants argued that plaintiffs were required to comply with section 425.13 because they were seeking "punitive damages 'for an injury that is directly related to the professional services provided by a health care provider

acting in its capacity as such.' "[2] Plaintiffs, however, argued that their claims did not arise out of defendants' professional medical services, but rather from defendants' "insurance decisions and practices." Plaintiffs contended that, in essence, their tort claims alleged that defendants had improperly withheld "insurance policy benefits" by denying necessary medical treatments and "creat[ing] a system whereby [their] financial interests were put ahead of Anna's life."

On April 14, 2001, the trial court heard oral argument on the motion to strike and ruled that section 425.13 was inapplicable to plaintiffs' claims, explaining: "this is an insurance bad faith case against an insurance company . . . it's a different animal [from medical malpractice]." In a subsequent minute order, the trial court stated that section 425.13 did not apply because plaintiffs' suit was not "merely an action for professional negligence."

### D.   *Petition for Writ of Mandate*

On June 16, 2011, defendants filed a petition for writ of mandate seeking an order from this court directing the superior court "to vacate its order . . . denying [p]etitioners' motion to strike [plaintiffs'] punitive damages claims and to enter a new order granting the [m]otion to strike the punitive damages claims." On June 23, 2011, we summarily denied defendants' petition. Defendants then filed a petition for review in the California Supreme Court.

While defendants' petition for review was pending in the Supreme Court, plaintiffs dismissed their punitive damages claims against Kaiser Hospitals and SCPMG without prejudice. In their opposition to defendants' petition for review, plaintiffs argued that, in light of the dismissals, the court need not reach "the merits of the denial of the motion to strike with respect to . . . [Kaiser Hospitals and SCPMG]." Plaintiffs further argued that section 425.13 did not apply to their claims against Kaiser Health Plan because it was not a health care provider.

On August 10, 2011, the Supreme Court granted defendants' petition for review and entered an order directing this court to vacate our "order denying mandate and to issue an order directing respondent superior court to show cause why the relief sought in the petition should not be granted." In compliance with that order, we vacated our order dated June 23, 2011, and issued an order to show cause.

---

[2] Defendants' motion to strike also argued that the facts pleaded in the complaint were insufficient to support punitive damages and that numerous other portions of the complaint should be stricken. None of these alternative arguments are relevant to defendants' petition for writ of mandate, which is predicated solely on the question of whether plaintiffs' claims are subject to section 425.13, subdivision (a).

## DISCUSSION

### A.  Standard of Review

■  "The standard of review for an order on a motion to strike punitive damages allegations is de novo. [Citation.] 'In passing on the correctness of a ruling on a motion to strike, judges read allegations of a pleading subject to a motion to strike as a whole, all parts in their context, and assume their truth.' [Citation.]" (*Turman, supra,* 191 Cal.App.4th at p. 63.)

### B.  Summary of Cases Interpreting the Scope of Section 425.13

"Section 425.13(a) establishes a procedure for claiming punitive damages in certain cases. It provides, 'In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code.' " (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 186 [10 Cal.Rptr.2d 208, 832 P.2d 924], italics omitted (*Central Pathology*).)

In *Central Pathology, supra,* 3 Cal.4th 181, the California Supreme Court considered the scope of claims subject to section 425.13. The plaintiffs, Constance and Michael Hull, filed a complaint against a pathology clinic and a physician for negligence and loss of consortium. Two months before trial, the plaintiffs moved to amend their complaint "to add causes of action for fraud and intentional infliction of emotional distress. The new causes of action alleged that [the physician] performed a pap smear on Constance, which was sent to [the pathology clinic] for analysis. It was further alleged that despite the presence of abnormal cells, defendants failed to notify Constance that she was developing cancer . . . and that [the physician] denied using [the pathology clinic] in an effort to cover up her medical negligence. The cause of action for intentional infliction of emotional distress alleged that defendants acted in an outrageous manner with the intent to cause severe emotional distress. Plaintiffs sought punitive damages under the new causes of action." (3 Cal.4th at p. 185.)

The pathology clinic filed a motion arguing that the trial court was required to strike the plaintiffs' punitive damages allegations because they had failed

to comply with section 425.13. The plaintiffs, however, contended that section 425.13 was limited to claims "arising out of . . . professional negligence" and therefore did not apply to their intentional tort claims. The trial court agreed with the plaintiffs and denied the motion. The appellate court denied the defendants' petition for writ of mandate. The California Supreme Court granted review.

The Supreme Court began its analysis by considering the language of section 425.13. Concluding that it was unclear whether the phrase "action for damages arising out of the professional negligence of a health care provider" was intended to encompass claims for "intentional torts allegedly committed by health care providers" (*Central Pathology, supra,* 3 Cal.4th at p. 186), the court reviewed the legislative history for further guidance.

■ In summarizing the legislative history, the court noted that a comment from the Assembly Subcommittee on the Administration of Justice indicated that section 425.13 was intended to " 'provide protection to health practitioners *in their capacity as practitioners.*' " (*Central Pathology, supra,* 3 Cal.4th at p. 189.) The comment emphasized that "lawsuits *unrelated* to a practitioner's conduct in providing health care related services were intended to be excluded from the ambit of section 425.13." (*Id.* at p. 190.) The court concluded that these comments demonstrated that the statute was not meant to apply solely to medical malpractice claims asserted against health care providers. Rather, according to the court, the Legislature intended section 425.13 to apply "whenever an injured party seeks punitive damages for an injury that is directly related to the professional services provided by a health care provider acting in its capacity as such . . . ." (*Central Pathology, supra,* 3 Cal.4th at p. 191.) The court clarified that, in making this determination, "[t]he allegations that identify the nature and cause of a plaintiff's injury must be examined to determine whether each is directly related to the manner in which professional services were provided." (*Id.* at p. 192.)

The court then applied its interpretation of section 425.13 to the plaintiffs' tort claims and found that the statute applied: "Plaintiffs' cause of action for fraud in this case is directly related to the manner in which defendants provided professional services. The claim emanates from the manner in which defendants performed and communicated the results of medical tests, a matter that is an ordinary and usual part of medical professional services. It is therefore governed by section 425.13(a). Plaintiffs' cause of action for intentional infliction of emotional distress is predicated on the same alleged acts as the fraud claim. Therefore, it too is directly related to defendants' performance of professional services and is governed by section 425.13(a)." (*Central Pathology, supra,* 3 Cal.4th at pp. 192–193.)

The holding in *Central Pathology* has been applied to numerous other types of tort claims brought against medical care providers. For example, in *Davis v. Superior Court* (1994) 27 Cal.App.4th 623 [33 Cal.Rptr.2d 6] (*Davis*), the plaintiff sued his employer's workers' compensation carrier and a physician who treated injuries the plaintiff sustained during the course of his employment. The plaintiff alleged that the carrier and the doctors it contracted with entered into a conspiracy whereby the doctors agreed to provide medical advice and treatment to patients below the standard of care. In exchange, the carrier agreed to continue sending patients to the doctors. The plaintiff further alleged that his treating physician had participated in this scheme by providing substandard care at the direction of the carrier. The plaintiff asserted that the physician's "acts were designed to curtail expensive treatment needed by [plaintiff]," thereby "ensur[ing] that [the physician] would continue to get business from [the carrier]." (*Id.* at p. 626.) The complaint included claims for fraud and conspiracy, and sought punitive damages against each defendant on both claims.

The physician filed a motion arguing that the trial court should strike the punitive damages allegations asserted against him because the plaintiff had failed to comply with section 425.13, subdivision (a). In opposition, the plaintiff argued that his claims were not subject to the statute because he sought "damages based on criminal conduct—conduct which cannot be considered to have arisen out of . . . professional negligence." (*Davis, supra,* 27 Cal.App.4th at p. 627.) The trial court agreed with the plaintiff and denied the motion.

The appellate court reversed, holding that the circumstances of the case were indistinguishable from *Central Pathology.* The court explained that "[the physician defendant] is accused of misrepresenting that he would properly treat [plaintiff], and that he was qualified to perform certain medical procedures. It is also alleged he lied about [plaintiff's] medical condition and falsified his findings. Even if, as [plaintiff] alleges, [the carrier] directed [the physician] to conduct himself in this manner, the fact remains that [plaintiff] is seeking damages for an injury that is directly related to the professional services rendered by [the physician] acting in his capacity as a health care provider. The conduct of which [the physician] is accused, if true, is unethical, illegal and immoral. It is, however, no more outrageous than the conduct of the *Central Pathology* defendant physician. [Plaintiff] was, therefore, required to comply with the requirements of section 425.13(a)." (*Davis, supra,* 27 Cal.App.4th at p. 629.)

Similarly, in *Palmer v. Superior Court* (2002) 103 Cal.App.4th 953 [127 Cal.Rptr.2d 252] (*Palmer*), the court concluded that section 425.13 applied to claims arising from a health care provider's recommendation that certain

health care services were not medically necessary. The plaintiff, William Palmer, filed a complaint against his medical insurer, PacifiCare, and his primary health care provider, Sharp Rees-Stealy Medical Group (SRS). SRS performed various medical services for PacifiCare's insureds, which included " 'making decisions as to whether requested medical services, equipment, and supplies for PacifiCare members [we]re "medically necessary." ' " (103 Cal.App.4th at p. 958.)

Palmer, who had lost his legs to a bacterial infection, alleged that his prosthetist recommended that SRS provide Palmer with a new type of prosthetic leg that was engineered from ultralight components. SRS informed Palmer that its utilization review department had determined that the prosthetic legs were not medically necessary and referred him to the PacifiCare appeals process. Palmer alleged that an SRS employee later informed him that the costs of the prosthetic legs greatly exceeded the fixed amount that SRS received from PacifiCare to provide Palmer with care. Palmer pursued authorization for the prosthetics through PacifiCare's appeals process, but PacifiCare continued to deny the request.

Palmer's complaint alleged that PacifiCare had breached "the implied covenant of good faith and fair dealing in the subscriber agreement . . . [through its] denial of the requested medical services and equipment." (*Palmer, supra,* 103 Cal.App.4th at p. 960.) The complaint also alleged intentional and negligent infliction of emotional distress against SRS "due to the manner in which plaintiff's request for the medical services and equipment was processed. Palmer claim[ed] SRS intentionally and willfully found that the prostheses were not medically necessary when they were, in fact, medically necessary . . . ." (*Ibid.,* fn. omitted.) SRS moved to strike the punitive damages allegations appearing in the intentional infliction of emotional distress claim, arguing that the plaintiff had failed to comply with section 425.13. The trial court granted the motion.

On appeal, Palmer argued that section 425.13 was inapplicable to his claim against SRS because "the services SRS was performing on behalf of PacifiCare, i.e., conducting utilization review services by evaluating Palmer's request for medical services . . . to determine their medical necessity," did not qualify as "health care services." (*Palmer, supra,* 103 Cal.App.4th at pp. 967, 968.) Rather, according Palmer, "his injuries relate[d] to actions taken by SRS and PacifiCare in administering the HMO subscriber agreement, and those actions operated to prevent him from receiving the requested health care services." (*Id.* at p. 968.)

The appellate court rejected the argument, explaining: "the allegedly injurious utilization review . . . conducted by . . . SRS . . . amounted to a

medical clinical judgment such as would arguably arise out of professional negligence. We disagree with Palmer that this was a purely administrative or economic role played by SRS. Rather, the . . . utilization review[s] [are] conducted by medical professionals . . . [who] carry out these functions by exercising medical judgment and applying clinical standards. [Citations.] Recall, Palmer's chief complaint is with the substance and conduct of the PacifiCare appeals process, and he is pursuing that claim through his cause of action against PacifiCare for the breach of the implied covenant of good faith and fair dealing in the subscriber agreement. That is the proper forum for those claims. However, to the extent Palmer seeks to plead intentional infliction of emotional distress against SRS for its part in those decisions, he was required to comply with the pleadings procedure of section 425.13 . . . ." (*Palmer, supra,* 103 Cal.App.4th at p. 972.)

C. *Section 425.13 Does Not Apply to Any Claims Remaining in This Suit*

As originally filed, plaintiffs' complaint included punitive damages allegations against two different types of entities. First, the complaint sought punitive damages from Kaiser Health Plan, which is a "licensed health care service plan" under California's Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act; Health & Saf. Code, § 1340 et seq.). The Knox-Keene Act defines a health care service plan as: "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (Health & Saf. Code, § 1345, subd. (f)(1).) In its role as a health care service plan, Kaiser Health Plan does not directly provide medical care to its subscribers. Instead, the Health Plan contracts with other Kaiser entities to deliver medical care to subscribers who enroll in its plans.

The complaint also sought punitive damages from Kaiser Hospitals and SCPMG, which are health care providers that contract with Kaiser Health Plan to provide medical services to plan members. The phrase "health care providers" generally applies to "licensed medical practitioners [and medical groups comprised of such practitioners] . . . who provide direct medical services to patients." (*Palmer, supra,* 103 Cal.App.4th at p. 967.)[3]

---

[3] The Knox-Keene Act defines "providers" as "any professional person, organization, health facility, or other person or institution licensed by the state to deliver or furnish health care services." (Health & Saf. Code, § 1345, subd. (i).) Section 425.13, subdivision (b) contains a similar definition: "For the purposes of this section, 'health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business

Defendants contend that section 425.13 applies to claims against both health care service plans and health care providers and, as a result, the trial court should have struck all of the punitive damages allegations in plaintiffs' complaint. We independently consider whether section 425.13 applies to claims against (1) health care service plans and (2) health care providers.

1. *Section 425.13 does not apply to claims against health care service plans*

Plaintiffs argue that section 425.13 does not apply to their claims against Kaiser Health Plan because the statute is limited to claims against health care providers. Defendants, however, argue that section 425.13 applies to any claim against a health care service plan that seeks compensation for injuries that are directly related to the quality and nature of medical services rendered by a medical care provider. Defendants further contend that plaintiffs' claims against Kaiser Health Plan are predicated on injuries caused by Kaiser health care providers' refusal to administer proper care, thereby triggering section 425.13's requirements.

A superficial reading of section 425.13 suggests that it could be reasonably interpreted in the manner proposed by defendants. The text of the statute does not state that it is limited to claims against medical care providers. Rather, the statute says it applies to "any action for damages arising out of the professional negligence of a health care provider . . . ." Based on this language, section 425.13 could be interpreted to apply to claims against any type of defendant—including health care service plans—if those claims "aris[e] out" of the professional negligence of a medical care provider.

██ The California Supreme Court has repeatedly stated, however, that the intended scope of section 425.13 cannot be determined based solely on the language of the statute. (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 709 [34 Cal.Rptr.2d 898, 882 P.2d 894] (*College Hospital*) ["the language of section 425.13(a) is uncertain . . ."].) For example, in *Central Pathology*, the court ruled that the "words of the statute" did not "clarif[y]" whether "intentional tort causes of action can 'arise out of' professional negligence . . . ." (*Central Pathology, supra*, 3 Cal.4th at p. 188.) Similarly, in *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771 [11 Cal.Rptr.3d 222, 86 P.3d 290] (*Covenant Care*), the court concluded that the language of section 425.13 was inconclusive as to whether an "elder abuse

and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider."

claim is one 'arising out of the professional negligence of a health care provider' . . . ." (*Covenant Care*, at p. 780.) In both cases, the court consulted the legislative history to aid in determining whether the precise type of claim at issue was subject to the statute.

Consistent with those decisions, we conclude that the text of the statute is unclear as to whether section 425.13 is intended to apply only to claims against health care providers, or whether it is intended to apply to claims against any type of defendant—including claims against health care service plans—that seek punitive damages for injuries that are directly related to professional services rendered by a health care provider. We therefore turn to the legislative history for guidance.

As originally drafted, section 425.13 left no ambiguity as to whether it was intended to extend to claims asserted against defendants other than medical care providers. The original version of the statute "provided, 'No claim for punitive damages *against a health care provider* shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed.' [Citation.]" (*Central Pathology, supra*, 3 Cal.4th at p. 188, italics added.) However, the statute was later "amended . . . by incorporating former section 425.13 into new subdivision (a) of that section and by altering the first sentence to read, 'In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included . . . .' [Citation.]" (*Id.* at p. 189, italics omitted.) According to the Legislature, "this amendment was [intended to be] declaratory of existing law. [Citation.]" (*Ibid.*)

The purpose of the Legislature's amendment was to address concerns that "the original version of section 425.13 was overbroad." (*Central Pathology, supra*, 3 Cal.4th at p. 189.) An Assembly subcommittee comment regarding the amendment explained that " '[a]s [originally] written, Section 4215.13 [*sic*] could apply to any lawsuit against any health care provider. . . . Arguably, this could include lawsuits unrelated to the practitioner's practice, such as defamation, fraud, and intentional torts. [¶] The author [of the original version of section 425.13] asserts that the intention . . . was to provide protection to health practitioners in their capacity as practitioners. Specifically, relief was sought from unsubstantiated claims of punitive damages in actions alleging professional negligence. There was no intent to protect practitioners in any other capacity. [The amendment] limits the application of Section [425.13(a)] to lawsuits involving allegations of a health practitioner's "professional negligence." ' [Citation.]" (*Ibid.*, italics omitted.)

This legislative history clearly implies that, as originally drafted and as amended, section 425.13 was only intended to apply to medical care providers. The original version of section 425.13 specifically limited the statute to claims against medical care providers. Although this language was subsequently amended in a manner suggesting that the section might apply to a broader category of defendants, the Legislature's comments regarding that amendment demonstrate that was not its intent.

■ First, the legislative comments noted that the amendment was "declaratory of existing law," thereby indicating that the amendment was not meant to broaden the scope of the statute beyond claims against medical care providers. (*Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2009) 176 Cal.App.4th 1249, 1256 [98 Cal.Rptr.3d 559] ["declaration by the Legislature that a statutory amendment is declaratory of existing law is . . . a factor entitled to due consideration"].) Second, the legislative history demonstrates that the purpose of the amendment was to preserve the original intent of the statute, which was " 'to provide protection to health practitioners in their capacity as practitioners.' " (*Central Pathology, supra*, 3 Cal.4th at p. 189, italics omitted.) More specifically, the amendment was intended to clarify that the statute did not apply to claims " 'unrelated to the practitioner's practice, such as defamation.' " (*Ibid.*, italics omitted.) Nothing in the history of the amendment suggests that the Legislature meant to broaden section 425.13's applicability to claims against any type of defendant that arose from the professional negligence of a health care provider. Rather, the clear intent was to protect health care providers in their professional capacity as such.

■ Our conclusion that the Legislature intended section 425.13 to apply to claims against medical care providers, as opposed to other classes of defendants, finds substantial support in the case law. For example, in *Central Pathology*, the Supreme Court concluded that the legislative history of section 425.13 demonstrated that the statute was passed "because [the Legislature] was concerned that unsubstantiated claims for punitive damages were being included in complaints *against health care providers.*" (*Central Pathology, supra*, 3 Cal.4th at p. 189, italics added.) The court emphasized that "the essential purpose" of the amendment to section 425.13 was "to restrict the application of section 425.13 to lawsuits brought *against health practitioners* 'in their capacity as practitioners.' " (3 Cal.4th at p. 190, italics added; see *id.* at p. 192 ["The clear intent of the Legislature is that any claim for punitive damages *in an action against a health care provider* be subject to the statute if the injury that is the basis for the claim was caused by conduct that was directly related to the rendition of professional services." (italics added)].)

In subsequent decisions, the Supreme Court has reiterated that the central purpose of the statute is to protect medical care providers. For example, in

*College Hospital, supra*, 8 Cal.4th 704, the court stated: "Although the language of section 425.13(a) is uncertain, its prophylactic purpose is clear—to protect health care providers from the onerous burden of defending against meritless punitive damage claims." (*Id.* at p. 709.) *College Hospital* also "emphasized that the primary purpose of section 425.13(a) was to establish a pretrial mechanism that bars ' "unsubstantiated" ' punitive damage claims brought against health care providers ' "in their [professional] capacity." ' [Citation.]" (*Id.* at p. 714.) Similarly, in *Covenant Care, supra*, 32 Cal.4th 771, the court explained that "the Legislature's intent in enacting the statute was to protect health care providers (or practitioners) . . . *in their professional capacity as providers* . . . ." (*Id.* at p. 785.)

Numerous appellate courts have made similar statements regarding the intended scope of section 425.13. For example, in *Little Co. of Mary Hospital v. Superior Court* (2008) 162 Cal.App.4th 261 [75 Cal.Rptr.3d 519], this division stated that the language of section 425.13 demonstrated that the statute's application was "limited both by the identity of the defendant [(i.e., medical care providers)] and the nature of the plaintiff's claim." (*Little Co. of Mary Hospital*, at p. 269.) In *Johnson v. Superior Court* (2002) 101 Cal.App.4th 869 [124 Cal.Rptr.2d 650], another division in this district concluded that the statute "was . . . adopted to protect health care providers" by "provid[ing] health care practitioners with a procedural hurdle designed to weed out meritless punitive damage claims." (*Id.* at pp. 878–879.) Numerous other appellate decisions include similar language. (See *Hung v. Wang* (1992) 8 Cal.App.4th 908, 920 [11 Cal.Rptr.2d 113] [". . . Code of Civil Procedure section 425.13 requires that a plaintiff seeking punitive damages against a health care provider obtain court permission before pleading that allegation . . . ."]; *Community Care & Rehabilitation Center v. Superior Court* (2000) 79 Cal.App.4th 787, 791 [94 Cal.Rptr.2d 343] [§ 425.13 was "enacted [as] a protection for medical professionals"], disapproved of on other grounds in *Covenant Care, supra*, 32 Cal.4th at p. 791, fn. 12; *Palmer, supra*, 103 Cal.App.4th at p. 961 ["[T]he Legislature added section 425.13 . . . due to related policy concerns ' "that unsubstantiated claims for punitive damages were being included in complaints against health care providers." ' [Citation.]"].)

■ Defendants' argument that section 425.13 may be applied to claims against health care service plans, rather than health care providers, is also in conflict with other sections of California codes. Civil Code section 3428, subdivision (c) states that "[h]ealth care service plans . . . are not health care providers under any provision of law, including, but not limited to . . . Section[] . . . 425.13 . . . of the Code of Civil Procedure." Likewise, Health and Safety Code section 1367.01, subdivision (m) clarifies that a health care service plan's role in determining the medical necessity of a requested procedure "shall [not] cause a health care service plan to be defined as a

health care provider for purposes of any provision of law, including . . . Section[] . . . 425.13 . . . of the Code of Civil Procedure." The language of these statutes demonstrates a clear intent to exclude health care service plans from the procedures required under section 425.13.

Defendants have not cited a single decision that has applied section 425.13 to claims pleaded against a health care service plan or any other type of entity that was not a medical care provider. They argue, however, that the facts of this case cannot be meaningfully distinguished from *Davis, supra,* 27 Cal.App.4th 623, or *Palmer, supra,* 103 Cal.App.4th 953. As discussed above, the plaintiff in *Davis* alleged that his physician had conspired with his workers' compensation carrier to provide substandard medical care to the carrier's members. In *Palmer,* the plaintiff sued his health care service plan and his primary care physician for falsely stating that certain services were not medically necessary, and therefore not covered by the plaintiff's health plan. In both cases, the court concluded that the plaintiff's claims against the medical care providers were subject to section 425.13 because they were directly related to the nature and quality of the medical care providers' professional services.

Although there are similarities between the Rahms' claims and those alleged in *Palmer* and *Davis,* defendants overlook a critical distinction: in both *Palmer* and *Davis* only the medical care providers moved to strike the punitive damages allegations pleaded against them; neither opinion considered or decided whether section 425.13 applied to the other defendants in the cases, who were not medical care providers. Therefore, neither decision has any relevance to the issue presented here: whether the statute applies to claims asserted against a health care service plan.

Defendants next assert that, even if section 425.13 does not generally apply to health care service plans, we should apply the statute under the circumstances of this case because plaintiffs' claims against Kaiser Health Plan "derive[]" entirely from "decisions of Kaiser's [health care providers]." Stated more simply, defendants contend that section 425.13 applies to claims that seek to hold a health care service plan vicariously liable for the acts of a health care provider. There are several reasons why this argument fails.

First, as explained above, the legislative history of section 425.13 and other statutes regulating the medical care industry demonstrate that section 425.13 was not intended to apply to health care service plans. Defendants have cited no authority indicating that the Legislature intended the statute to apply to such entities in instances where a plaintiff proceeds under a theory of vicarious liability. We decline to read such an exception into the statute.

Second, extending section 425.13 in the manner suggested by defendants would serve no purpose because California statutes immunize health care service plans from liability for acts committed by medical care providers. Health and Safety Code section 1371.25 states that "[a] plan, any entity contracting with a plan, and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of . . . others." This statute has been interpreted as "prevent[ing] a health care service plan from being held vicariously liable for a medical provider's acts or omissions." (*Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1393 [130 Cal.Rptr.3d 714] (*Martin*); see *Watanabe v. California Physicians' Service* (2008) 169 Cal.App.4th 56, 63–64 [86 Cal.Rptr.3d 374].) Extending section 425.13 to claims that seek to impose vicarious liability on health care service plans for the acts of their providers would therefore serve no purpose because the Legislature has expressly prohibited such claims.

Third, even if we were to accept defendants' contention that section 425.13 may apply to claims seeking to hold a health care plan vicariously liable for professional services rendered by a health care provider, that is not what plaintiffs have alleged here. "A claim is based on vicarious liability when a party free from fault is held liable for another party's acts or omissions. [Citation.] A claim is based on direct liability when a party is held liable for its own acts or omissions." (*Martin, supra*, 198 Cal.App.4th at p. 1407.) According to defendants, plaintiffs' claims against Kaiser Health Plan allege that it "engaged in conduct with respect to [plaintiffs] that is derivative of, and not separate or independent from, the actions of Kaiser's physicians."

We disagree with defendants' characterization of plaintiffs' claims. A fair reading of the complaint indicates that plaintiffs allege that Kaiser Health Plan devised a compensation scheme that encouraged Kaiser health care providers to withhold medically necessary services from plan members. This scheme allegedly required Kaiser's physicians to take into account "the cost . . . of the [requested] treatment" when determining whether the care was medically necessary. The physicians, in turn, were paid "bonuses which [we]re dependent upon the cost savings realized . . . due to the physicians['] withholding of treatment and/or care of the insureds." Thus, liberally construed,[4] the complaint does not merely assert that Kaiser Health Plan is liable for the improper medical decisions made by Kaiser's physicians (delaying authorization of an MRI of Anna's back). Rather, the complaint asserts that Kaiser Health Plan induced such conduct by providing financial incentives to deny expensive medical treatments.

---

[4] Code of Civil Procedure section 452 requires that, when "determining [the] effect [of a pleading]," its "allegations must be liberally construed . . . ."

Finally, defendants argue that section 425.13 applies to claims against Kaiser Health Plan because the plan is part of "a fully integrated medical services program" that includes medical care providers such as Kaiser Hospitals and SCPMG. In support, defendants cite language from the health plan service agreement stating that "Kaiser Permanente provides Services directly to our members through an integrated medical care program [in which] Health Plan, Plan Hospitals, and the Medical Group work together to provide our Members with quality care." Defendants appear to contend that section 425.13 applies whenever a plaintiff asserts claims against a health care service plan that is part of a larger group of entities that includes medical care providers.[5] We disagree.

■ The legislative history of section 425.13 and various provisions in California codes demonstrate that the procedural requirements described in the statute do not apply to claims against health care service plans. Because defendants admit that Kaiser Health Plan is a health care service plan, rather than a health care provider, the trial court did not err in refusing to strike the punitive damages allegations asserted against the Health Plan.

### 2. Plaintiffs have dismissed their punitive damages allegations against Kaiser's health care providers

Defendants' petition for writ of mandate also argues that the trial court erred in failing to strike plaintiffs' punitive damages allegations against Kaiser Hospitals and SCPMG, which are both health care providers. However, after defendants filed their petition, plaintiffs dismissed their punitive damages claims against Kaiser Hospitals and SCPMG without prejudice. Plaintiffs argue that, in light of those dismissals, "the merits of the denial of the motion to strike with respect to [Kaiser Hospitals and SCPMG] are no longer an issue in the case." Defendants' reply brief, which was filed after plaintiffs dismissed their punitive damages allegations, does not state any grounds for review of the portion of the trial court's ruling that pertains to the health care providers. Instead, defendants' reply brief argues only that section 425.13 applies to plaintiffs' claims against Kaiser Health Plan.

■ Currently, there are no punitive damages allegations pending against Kaiser Hospitals or SCPMG. Therefore, ordering the trial court to strike such allegations would serve no purpose. We decline to review an issue that will have no effect on the parties. (See Civ. Code, § 3532 ["The law neither does nor requires idle acts."]; *Garibaldi v. City of Daly City* (1943) 61 Cal.App.2d

---

[5] The record contains no evidence concerning the relationship or corporate structure that exists between Kaiser Health Plan, Kaiser Hospitals and SCPMG. The only allegation regarding the nature of these entities is that Kaiser Health Plan contracts with Kaiser Hospitals and SCPMG to provide medical services to plan members.

514, 517 [143 P.2d 397] ["An appellate court will not determine a question which will have no effect upon the status of the parties."].)

## DISPOSITION

The petition is denied. The parties shall bear their own costs on appeal.

Perluss, P. J., and Woods, J., concurred.

Petitioners' petition for review by the Supreme Court was denied April 25, 2012, S201085. Werdegar, J., did not participate therein.