Filed 5/19/22 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DIVINO PLASTIC SURGERY, INC. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF SAN DIEGO COUNTY, <br><br> Respondent; <br><br><br> MOISES ESPINOZA et al., <br><br> Real Parties in Interest. | D079661 <br><br> (San Diego County Super. Ct. No. 37-2019-00058375-CU-MM-CTL) <br><br><br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING <br><br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on April 22, 2022, be modified as follows:

1.      On page 9, after the first sentence at the top of the page (ending "qualified to administer anesthesia"), add as footnote 3 the following footnote, which will require the renumbering of all subsequent footnotes:

In a petition for rehearing, the Espinozas complain that in describing their argument this way, we "misstate[d] or

miscomprehend[ed] [their] argument" and "missed [their] most important points." Those points are: (1) Hernandez was forbidden by law to administer any anesthetic; (2) Lang acted outside the scope of her nursing license, because she had received no oral or written instructions from Chacon regarding the anesthetics she gave Megan; and (3) Chacon acted outside the scope of his medical license, because he allowed Hernandez to give Megan a local anesthetic and Lang to give Megan a sedative combination of anesthetics without express instructions. The points, which merely restate with minor changes the contention that the Espinozas made in their return and that we addressed in our original opinion, do not warrant rehearing. (See *Gentis v. Safeguard Business Systems, Inc.* (1998) 60 Cal.App.4th 1294, 1308 [restatement of arguments raised and considered on appeal did not warrant rehearing].) Nevertheless, we have modified the opinion to address more explicitly the newly emphasized points.

2. Delete the first full paragraph on page 9 (beginning "Chacon, as a licensed physician . . . ."), and replace with the following paragraph:

Chacon, as a licensed physician and surgeon, was authorized "to use drugs . . . in or upon human beings and to sever or penetrate the tissues of human beings . . . in the treatment of diseases, injuries, deformities, and other physical and mental conditions." (Bus. & Prof. Code, § 2051.) The administration of anesthesia always involves use of drugs and sometimes penetration of tissues, "is obviously an integral part of the surgical treatment which it facilitates," and thus "com[es] within the practice of medicine" authorized by statute. (*Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74, 81 (*Magit*); accord, *PM & R Associates v. Workers' Comp. Appeals Bd.* (2000) 80 Cal.App.4th 357, 369.) In performing the augmentation mammoplasty on Megan, Chacon did not have to do everything himself and could use others who were not licensed as physicians and surgeons to administer anesthesia and to perform other supportive tasks. (See Bus. & Prof. Code, § 2061 [Medical Practice Act does not limit practice of other licensed, certified, or registered practitioners of healing arts]; *Magit*, at pp. 82-83 [nurse may perform some medical acts under physician's direction and supervision].) Lang, as a registered nurse, could administer anesthetics and other drugs ordered by Chacon without his supervision. (Bus. & Prof. Code, § 2725, subd. (b)(2); *California Society of Anesthesiologists v. Brown* (2012) 204 Cal.App.4th 390, 408; see 67 Ops.Cal.Atty.Gen. 122, 139 (1984) ["a registered nurse may lawfully

2

administer an anesthetic, general or regional, under the authority of subdivision (b) of section 2725 when a physician, . . . acting within the scope of his or her license, orders such nurse to administer the same to a particular patient"].) Hernandez, as a medical assistant, did not have to be licensed and could administer drugs and perform other supportive services under Chacon's authorization and supervision. (Bus. & Prof. Code, § 2069, subds. (a)(1), (c)(1); *PM & R Associates*, at p. 365.) In sum, the administration of the anesthesia that allegedly caused Megan's death was a type of activity that Chacon and Divino, through its employees, were licensed to perform as health care providers.

3. Delete the first full paragraph on page 10 (beginning "Chacon and Divino did not . . . ."), replace with the following two paragraphs, and add new footnote 4 as indicated, which will require the renumbering of all subsequent footnotes:

Chacon and Divino did not lose their status as health care providers entitled to the protections of section 425.13 merely because the Espinozas allege the manner in which Chacon and Divino's employees performed the acts that caused Megan's death fell outside the scope of the applicable licenses. Instructive on this point is a recent case involving the vicarious liability of physicians for the acts of physician assistants who performed medical services without the statutorily required supervision by the physicians, in which our Supreme Court had to determine whether the services were " 'within the scope of services for which the provider is licensed' and 'are not within any restriction imposed by the licensing agency or licensed hospital.' " (*Lopez v. Ledesma* (2022) 12 Cal.5th 848, 853.) The Supreme Court noted "[t]he language 'scope of services for which the provider is licensed' [citation] is naturally understood as the general range of activities encompassed by the provider's license" (*id.* at p. 857), and went on to conclude that a health care provider does not act outside the scope of the provider's license or come within a restriction simply by committing unprofessional conduct, such as noncompliance with supervisory regulations, or misconduct that could result in professional discipline or even criminal liability (*id.* at pp. 864-865). As discussed above, the general range of activities authorized by Chacon's medical license included the administration of anesthesia during the augmentation mammoplasty he performed on Megan. Even if Chacon committed conduct that was unprofessional or that could subject him to

3

discipline or criminal liability by allowing Lang to give Megan sedatives and other anesthetics without an express order from him or by allowing Hernandez to give Megan a local anesthetic,[4] under *Lopez* he did not thereby exceed the scope of services his medical license authorized him to perform. We therefore conclude that although Chacon or his agents might have been acting unlawfully, he was acting as a health care provider within the meaning of section 425.13.

Other cases support our conclusion. (See, e.g., *Waters v. Bourhis* (1985) 40 Cal.3d 424, 436 (*Waters*) [psychiatrist's "acts contrary to professional standards" or "instances of 'unprofessional conduct' " that arose out of course of psychiatric treatment were not outside scope of license]; *Prince v. Sutter Health Central* (2008) 161 Cal.App.4th 971, 977 [registered clinical social worker's alleged violation of statute mandating certain disclosures to patient did "not mean [she] was not a health care provider, nor change the fact that she performed a mental health evaluation"]; *Cooper v. Superior Court* (1997) 56 Cal.App.4th 744, 749 [gynecologist's use of "incorrect medical procedures" and "improper sexual touching" in examining patient did not cause him to lose protections of section 425.13]; *United Western Medical Centers v. Superior Court* (1996) 42 Cal.App.4th 500, 505 [intentional misconduct of staff against patient did not cause hospital to lose protections of section 425.13].) Were we to conclude otherwise, a plaintiff could sue a health care provider for punitive damages without complying with section 425.13 simply by alleging the provider acted outside the scope of the license. Such a rule would defeat the "prophylactic purpose" of the statute "to protect health care providers from the onerous burden of defending against meritless punitive damage claims." (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 709.)

---

[4] The Espinozas are correct that a medical assistant may not administer a local anesthetic. (Bus. & Prof. Code, § 2069, subd. (c)(2).) That does not affect our analysis or conclusion, however. Hernandez's administration of a local anesthetic to Megan at Chacon's direction may have constituted unprofessional conduct (*id.*, § 2234, subd. (a) [assisting in violation of any provision of Medical Practice Act is unprofessional conduct]), but as explained in the text that would not by itself take the conduct outside the scope of activities authorized by his medical license. Further, in determining the applicability of section 425.13, "the focus must be upon the allegedly injurious conduct of the health care provider." (*Palmer v. Superior Court* (2002) 103 Cal.App.4th 953, 962 (*Palmer*).) An uncontradicted declaration Chacon

4

submitted to the trial court from a board-certified anesthesiologist stated that Hernandez's administration of the local anesthetic did not cause Megan's death. Hernandez's conduct is thus irrelevant to determining the applicability of section 425.13.

4.    On page 15, in the second paragraph, delete the citation "(See pp. 13-14, *ante.*)" and replace with "(See pp. 15-16, *ante.*)"

5.    On page 17, at the end of the first sentence of the last paragraph (ending "untimeliness argument in their return"), add as footnote 7 the following footnote, which will require the renumbering of all subsequent footnotes:

In their petition for rehearing, the Espinozas complain we "**MISSED ONE OF [THEIR] MOST IMPORTANT ARGUMENTS REGARDING THE COURT'S AUTHORITY TO GRANT EXTRAORDINARY RELIEF**," namely, that they "were **not afforded an opportunity** to 'respond directly to Chacon's untimeliness argument in their return' " because Chacon raised the argument "as a basis for extraordinary [writ] relief <u>for the first time</u> in [his] reply." This complaint is meritless.

In the introduction to the petition, Chacon stated that "the trial court erroneously granted [the Espinozas'] *untimely* motion to amend the complaint to add punitive damages." (Italics added.) In a section explaining the necessity of writ relief, Chacon alleged such relief was needed "to correct the trial court's error [in] granting [the Espinozas'] motion to amend the complaint to add an *untimely* claim for punitive damages." (Italics added.) In the formal allegations of the petition, Chacon included the heading, "**[THE ESPINOZAS] MADE AN *UNTIMELY* MOTION TO AMEND THEIR COMPLAINT TO ADD PUNITIVE DAMAGES IN VIOLATION OF SECTION 425.13**," and the allegation that the Espinozas had not complied with the "procedural requirements" of section 425.13. (Italics added.) Although the Espinozas correctly point out that the legal analysis section of the petition does not contain a heading and argument specifically devoted to untimeliness, that is because in the order Chacon is challenging the trial court did not rule on the untimeliness argument he had made in opposition to the Espinozas' motion to amend. Because the trial court instead ruled section 425.13 did not apply to the Espinozas' claim for

punitive damages and Chacon had waived any right to demand compliance with the statute, he understandably focused his legal analysis on attacking those grounds. Chacon did not thereby abandon his untimeliness argument or mislead the Espinozas into thinking he was not seeking writ relief on the ground that the trial court had erroneously granted their untimely motion to amend. To the contrary, the Espinozas manifested their awareness of the untimeliness argument in the first paragraph of their informal response, where they quoted the petition and wrote, "They [i.e., Chacon and Divino] maintain '[w]rit relief is necessary to correct the trial court's error [in] granting [the Espinozas'] motion to amend the complaint to add an *untimely* claim for punitive damages.' " (Italics added.)

The Espinozas thus had the opportunity to respond to Chacon's untimeliness argument but chose not to do so. No rehearing is required to give them another opportunity. (See *Save Laurel Way v. City of Redwood City* (2017) 14 Cal.App.5th 1005, 1015, fn. 9 [rehearing not warranted to allow party to brief issue that was fairly included in issues raised but party did not address]; *Structural Steel Fabricators, Inc. v. City of Orange* (1991) 234 Cal.App.3d 1206, 1213 [rejecting as "at best disingenuous" contention rehearing was required to address unbriefed issue when party had acknowledged issue in trial and appellate courts].)

There is no change in the judgment.

The petition for rehearing filed by real parties in interest is denied.

HUFFMAN, Acting P. J.

Copies to: All parties

6

Filed 4/22/22 (unmodified opinion)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DIVINO PLASTIC SURGERY, INC. et al., | D079661 |
| Petitioners, | (San Diego County Super. Ct. No. 37-2019-00058375-CU-MM-CTL) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| MOISES ESPINOZA et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDING in mandate challenging an order of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Petition granted.

Cole Pedroza, Kenneth R. Pedroza, Cassidy C. Davenport, Zena Jacobsen; Hegeler & Anderson, Barton H. Hegeler and Storm P. Anderson for Petitioners.

No appearance for Respondent.

Niddrie Addams Fuller Singh and David A. Niddrie for Real Parties in Interest.

In this original proceeding, a surgeon and his clinic seek a writ directing the trial court to vacate its order allowing the survivors of a patient who died from a surgical procedure to amend their complaint to assert a claim for punitive damages. The evidence of the misconduct of the surgeon and the employees of his clinic that the survivors submitted with their motion for leave to amend, if believed by the trier of fact, might well support an award of punitive damages. Nevertheless, because the survivors did not move to amend within the time mandated by statute, we grant the requested relief.

## I.
## BACKGROUND

### A. *Fatal Surgery*

Carlos Chacon, M.D., performed an augmentation mammoplasty on Megan Espinoza at his surgical clinic, Divino Plastic Surgery, Inc. (Divino; Chacon and Divino are collectively called Chacon when it is unnecessary to distinguish them). During the surgery, Megan went into cardiopulmonary arrest. Megan remained intubated and unresponsive until she died about six weeks later.

### B. *Original Complaint*

On October 21, 2019, Megan's husband, Moises Espinoza, and two minor children filed a complaint for damages against Chacon, Divino, and Heather Lang, a registered nurse who assisted Chacon during Megan's surgery. The Espinozas alleged Chacon had told Megan a licensed anesthesiologist would be present during the augmentation mammoplasty to

2

administer the anesthesia and to monitor her, but Chacon and Lang actually administered multiple anesthetics, even though neither was licensed to do so, and failed to monitor Megan during the procedure. As a result, the Espinozas alleged, Megan went into cardiopulmonary arrest and, although Chacon and Lang performed cardiopulmonary resuscitation on Megan for approximately three hours without her consent, she never regained consciousness before she died. The Espinozas included in the complaint counts for wrongful death due to medical malpractice, general negligence, neglect of a dependent adult (Welf. & Inst. Code, § 15600 et seq.), intentional misrepresentation, promissory fraud, negligent misrepresentation, unfair competition (Bus. & Prof. Code, § 17200), and battery. The intentional misrepresentation and promissory fraud counts contained allegations that Chacon had acted with "malice, oppression, and/or fraud" and with intent to harm or conscious disregard of probable harm, but neither those counts nor the prayer for relief mentioned punitive damages.

C.    *Request for Statement of Damages*

Chacon served Moises with a request for a statement of damages. Moises responded he sought "special (economic) damages for the loss of financial support and household services" and for "funeral and burial expenses," and "general (non-economic) damages for the loss of care, comfort, society, protection, advice, training, moral support and emotional support and all other elements of general damages." The response did not mention punitive damages.

D.    *Pleading Challenges*

The trial court sustained without leave to amend Chacon's demurrer to the count for neglect of a dependent adult and overruled the demurrer to the intentional misrepresentation and promissory fraud counts. The court

3

granted Chacon's motion to strike an allegation from the unfair competition count with leave to amend.

The Espinozas filed a first amended complaint that deleted the count for neglect of a dependent adult and otherwise was substantially the same as the original complaint. In particular, the counts for intentional misrepresentation and promissory fraud again included allegations Chacon had acted with "malice, oppression, and/or fraud" and with intent to harm or conscious disregard of probable harm, but neither those counts nor the prayer for relief mentioned punitive damages. After Chacon filed a motion to strike, the Espinozas agreed to delete from the first amended complaint all allegations and prayers for attorney fees.

E.    *Trial Setting Conference*

At a case management conference on February 19, 2021, the trial court set trial for January 28, 2022. The trial date was later continued.

F.    *Motion to Amend to Seek Punitive Damages*

On August 3, 2021, the Espinozas moved for leave to file a second amended complaint to add factual allegations to support existing counts (including Chacon's misrepresentation that he was a board-certified plastic surgeon and Divino's employment of an unlicensed medical assistant, Carla Hernandez, who administered local anesthesia to Megan) and a prayer for punitive damages. The Espinozas alleged they had learned new facts in discovery that justified further amendment. In opposition, Chacon argued the motion was untimely, because it was not filed at least nine months before the initial trial date as required by Code of Civil Procedure section 425.13;[1]

---

[1]    "(a) In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The

4

and the Espinozas did not have a substantial probability of prevailing on a claim for punitive damages, because the thrust of the underlying action was wrongful death for which punitive damages were unavailable. In reply, the Espinozas argued Chacon waived the right to demand compliance with section 425.13 by not including in his challenges to prior pleadings any attack on the "punitive damages allegations" included in the intentional misrepresentation and promissory fraud counts, by which the Espinozas apparently meant the allegations of "malice, oppression, and/or fraud" included in those counts. The Espinozas also argued the statute did not apply to their claims to the extent they were based on the administration of anesthesia by Lang and Hernandez, neither of whom was licensed for that, and on Chacon's false representations on the Internet that he was a board-certified plastic surgeon.

---

court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code. *The court shall not grant a motion allowing the filing of an amended pleading that includes a claim for punitive damages if the motion for such an order is not filed within two years after the complaint or initial pleading is filed or not less than nine months before the date the matter is first set for trial, whichever is earlier.*

"(b) For the purposes of this section, 'health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider." (Code Civ. Proc., § 425.13, italics added; subsequent undesignated section references are to this code.)

5

The trial court held a hearing and requested supplemental briefing on the applicability of section 425.13. Chacon argued he had not waived the right to demand compliance with the statute, because the Espinozas had not asserted a claim for punitive damages until they moved for leave to file a second amended complaint, and the statute applied to the intentional tort counts because they arose out of his provision of medical care to Megan. The Espinozas argued their pleadings had contained punitive damages claims from the commencement of the underlying action and Chacon waited too long to challenge the claims; section 425.13 did not apply to claims based on the provision of services (administration of anesthesia) by Lang or Hernandez for which they were not licensed and for which Chacon was vicariously liable; and punitive damages were available on the claims that survived Megan's death and passed to her successors.

The trial court held another hearing and granted the motion for leave to file a second amended complaint. The court ruled the intentional tort counts were based on conduct outside the scope of section 425.13 and Chacon had waived the right to demand compliance with the statute by not challenging "the allegations going to punitive damages" in prior pleadings.

G. *Writ Proceeding*

Chacon challenged the trial court's order by petitioning this court for a writ of mandate. We issued an order to show cause,[2] obtained further pleadings from the parties, and heard argument.

_____

[2] Our issuance of the order to show cause effectively determined Chacon had no adequate remedy in the ordinary course of law and writ review was appropriate. (*Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 476-477; *Cryolife, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1145, 1152 (*Cryolife*); *Community Care & Rehabilitation Center v. Superior Court* (2000) 79 Cal.App.4th 787, 790, fn. 3.) We thus reject the Espinozas' contention

6

II.

DISCUSSION

The parties dispute three issues: (1) whether section 425.13 applies to the claim for punitive damages the Espinozas seek to add to their complaint; (2) whether the Espinozas satisfied the procedural requirements of the statute; and (3) whether Chacon waived compliance with those requirements. We resolve each dispute in turn.

A. *Applicability of Section 425.13*

We first consider the applicability of section 425.13 to the Espinozas' claim for punitive damages. Section 425.13 governs a claim for punitive damages in "any action for damages *arising out of the professional negligence of a health care provider.*" (§ 425.13, subd. (a), italics added.) Chacon and Divino contend the statute applies to the Espinozas' claim because they are health care providers and the lawsuit against them arises out of preoperative discussions with Megan about surgery and provision of treatment during surgery. The Espinozas contend the statute does not apply because Chacon and Divino's employees were not trained or licensed to provide anesthesia to Megan in the manner they did and the wrongs committed against her do not relate directly to provision of medical services. Resolution of this dispute requires de novo examination of the allegations of the Espinozas' pleadings. (*Pomona Valley Hospital Medical Center v. Superior Court* (2013) 213 Cal.App.4th 828, 835; *Cryolife, supra,* 110 Cal.App.4th at p. 1157; *Johnson v. Superior Court* (2002) 101 Cal.App.4th 869, 883.) Having examined the allegations, we conclude section 425.13 applies to the Espinozas' punitive damages claim for the reasons set out below.

---

Chacon's remedy by trial and appeal is adequate and makes writ review unnecessary.

7

1.    *Health Care Provider*

Chacon and Divino are both health care providers within the meaning of section 425.13.  The statute defines "health care provider" by reference to several licensing statutes, including persons licensed "pursuant to Division 2 . . . of the Business and Professions Code," and "any clinic . . . or health facility, licensed pursuant to Division 2 . . . of the Health and Safety Code." (§ 425.13, subd. (b).)  Article 3 of Chapter 5 of Division 2 of the Business and Professions Code prescribes the licensing requirements for physicians and surgeons.  (Bus. & Prof. Code, § 2050 et seq.)  Article 2.5 of Chapter 1 of Division 2 of the Health and Safety Code prescribes the licensing requirements for clinics (Health & Saf. Code, § 1221 et seq.), including surgical clinics (Health & Saf. Code, § 1204, subd. (b)(1)); and Article 1 of Chapter 2 of Division 2 of the Health and Safety Code governs licensing of health facilities (Health & Saf. Code, § 1250 et seq.).  In all versions of their complaint, the Espinozas alleged Chacon is a physician licensed to practice medicine in California and Divino is a licensed surgical facility.  Those allegations are binding on the Espinozas.  (*Shirvanyan v. Los Angeles Community College Dist.* (2020) 59 Cal.App.5th 82, 100; *Uhrich v. State Farm Fire & Casualty Co.* (2003) 109 Cal.App.4th 598, 613.)

The Espinozas nevertheless argue Chacon and Divino do not qualify as health care providers under section 425.13 because they were not licensed to provide the services in the manner alleged.  The Espinozas contend Chacon was not a licensed anesthesiologist and lacked the training, skill, and experience needed to rescue Megan from the anesthesia overdose; Divino employee Lang (a registered nurse) acted outside the scope of her license by administering anesthesia without supervision by Chacon; and Divino

8

employee Hernandez (a medical assistant) was not licensed or otherwise qualified to administer anesthesia.  We disagree.

Chacon, as a licensed physician and surgeon, was authorized "to use drugs . . . in or upon human beings and to sever or penetrate the tissues of human beings . . . in the treatment of diseases, injuries, deformities, and other physical and mental conditions."  (Bus. & Prof. Code, § 2051.)  The administration of anesthesia always involves use of drugs and sometimes penetration of tissues, "is obviously an integral part of the surgical treatment which it facilitates," and thus "com[es] within the practice of medicine" authorized by statute.  (*Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74, 81 (*Magit*); accord, *PM & R Associates v. Workers' Comp. Appeals Bd.* (2000) 80 Cal.App.4th 357, 369.)  Lang, as a registered nurse, could administer anesthetics and other drugs ordered by a physician without supervision by the physician.  (Bus. & Prof. Code, § 2725, subd. (b)(2); *California Society of Anesthesiologists v. Brown* (2012) 204 Cal.App.4th 390, 408; see 67 Ops.Cal.Atty.Gen. 122, 139 (1984) ["a registered nurse may lawfully administer an anesthetic, general or regional, under the authority of subdivision (b) of section 2725 when a physician, . . . acting within the scope of his or her license, orders such nurse to administer the same to a particular patient"].)  Hernandez, as a medical assistant, did not have to be licensed and could administer drugs and perform other supportive services under the authorization and supervision of a physician.  (Bus. & Prof. Code, § 2069; *PM & R Associates*, at p. 365.)  In sum, Chacon and Divino, through its employees, were acting as health care providers in administering anesthesia and providing other services to Megan as part of the augmentation mammoplasty.

Chacon and Divino did not lose their status as health care providers entitled to the protections of section 425.13 merely because the Espinozas allege the manner in which Chacon and Divino's employees performed the acts that caused Megan's death fell outside the scope of the applicable licenses.  (See *Lopez v. Ledesma* (2022) 12 Cal.5th 848, 853 [physician assistant's acts unsupervised by physician were not outside license]; *Waters v. Bourhis* (1985) 40 Cal.3d 424, 436 (*Waters*) [psychiatrist's "acts contrary to professional standards" were not outside license]; *Prince v. Sutter Health Central* (2008) 161 Cal.App.4th 971, 977 [registered clinical social worker's alleged violation of statute mandating certain disclosures to patient did "not mean [she] was not a health care provider, nor change the fact that she performed a mental health evaluation"]; *Cooper v. Superior Court* (1997) 56 Cal.App.4th 744, 749 [gynecologist's use of "incorrect medical procedures" and "improper sexual touching" in examining patient did not cause him to lose protections of section 425.13]; *United Western Medical Centers v. Superior Court* (1996) 42 Cal.App.4th 500, 505 [intentional misconduct of staff against patient did not cause hospital to lose protections of section 425.13].)  Were the rule otherwise, a plaintiff could sue a health care provider for punitive damages without complying with section 425.13 simply by alleging the provider acted outside the scope of the license.  Such a rule would defeat the "prophylactic purpose" of the statute "to protect health care providers from the onerous burden of defending against meritless punitive damage claims."  (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 709.)

2.     *Professional Negligence*

The claims for which the Espinozas seek punitive damages arise out of professional negligence within the meaning of section 425.13.  A claim arises

10

out of professional negligence "if the injury that is the basis for the claim was caused by conduct that was directly related to the rendition of professional services." (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 192 (*Central Pathology*).) "[I]dentifying a cause of action as an 'intentional tort' as opposed to 'negligence' does not itself remove the claim from the requirements of section 425.13[, subdivision] (a). The allegations that identify the nature and cause of a plaintiff's injury must be examined to determine whether each is directly related to the manner in which professional services were provided." (*Central Pathology*, at p. 192; accord, *Palmer v. Superior Court* (2002) 103 Cal.App.4th 953, 968 (*Palmer*).) As we explain below, the Espinozas' counts for intentional misrepresentation, promissory fraud, and battery all arise out of conduct directly related to Chacon's provision of medical services to Megan.

      a.    *Intentional Misrepresentation and Promissory Fraud*

Section 425.13 applies to the Espinozas' intentional misrepresentation and promissory fraud counts. The statute covers claims based on alleged misrepresentations that directly relate to acts a physician "ordinarily would be expected to perform in his or her capacity as a health care provider." (*Davis v. Superior Court* (1994) 27 Cal.App.4th 623, 629 (*Davis*); accord, *Palmer, supra,* 103 Cal.App.4th at p. 962.) The Espinozas base their claims on allegations Megan died because she reasonably relied on Chacon's false representations he was a board-certified plastic surgeon and would have a licensed anesthesiologist present during the augmentation mammoplasty to administer anesthesia and monitor her, which he made to induce her to undergo the surgery. In other words, the Espinozas allege Chacon misrepresented "he was qualified to perform certain medical procedures" and "he would properly treat [Megan]." (*Davis*, at p. 629.) Hence, "as a matter of

11

law the misrepresentation[s] occurred during the rendition of medical services and section 425.13[ ] applies." (*Davis*, at p. 629.)

The Espinozas argue, however, that "not all conversations between doctor and patient relate directly . . . to . . . professional services," and the conversations underlying their fraud-based counts do not do so because Chacon made the misrepresentations "so that he could enrich himself." As support for this argument, they cite cases that involved conversations that did not relate directly to professional services[3] and conduct by health care providers that did not constitute professional negligence within the meaning of the Medical Injury Compensation Reform Act (MICRA).[4] There are several flaws in this argument.

---

[3] See, e.g., *Engalla v. Permanente Medical Group* (1997) 15 Cal.4th 951, 973-974 (health care service plan allegedly induced members to agree to arbitration by false representations about timely appointment of arbitrators); *Bundren v. Superior Court* (1983) 145 Cal.App.3d 784, 788 (hospital employee dunned patient in "abusive, rude and inconsiderate" manner).

[4] See, e.g., *Waters*, *supra*, 40 Cal.3d at pages 436-437 (MICRA limit on attorney fees applies to professional negligence but not intentional torts); *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 287, 322-323 (*Bigler-Engler*) (MICRA damages cap did not apply to physician's concealment of financial interest in transaction he recommended to patient); *So v. Shin* (2013) 212 Cal.App.4th 652, 667 (MICRA limitations period did not apply to claim based on anesthesiologist's tortious conduct "for her own benefit, to forestall an embarrassing report that might damage her professional reputation—*not* for the benefit of her patient"); *Flores v. Natividad Medical Center* (1987) 192 Cal.App.3d 1106, 1113-1117 (MICRA did not apply to claim against state for physician employees' failure to summon medical aid for prisoner); *Atienza v. Taub* (1987) 194 Cal.App.3d 388, 391-394 (physician's sexual relationship with patient was not professional negligence under MICRA because physician did not initiate relationship under guise of treatment); *Baker v. Sadick* (1984) 162 Cal.App.3d 618, 626-627 (MICRA damages cap did not preclude award of punitive damages against physician who committed medical malpractice and intentional torts); *Nelson v. Gaunt*

12

First, an allegedly improper financial motivation for a physician's misrepresentations does not suffice to render section 425.13 inapplicable. (*Davis*, *supra*, 27 Cal.App.4th at p. 628.)  "The focus is on the physician's conduct."  (*Id.* at p. 629.)  Where, as here, "the doctor accused of the improper behavior was engaged in the practice of medicine at the time he or she was consulted by the patient," section 425.13 applies.  (*Davis*, at p. 629.)

Second, although "lawsuits unrelated to the practitioner's conduct in providing health care were not intended to be included" within the scope of section 425.13 (*Williams v. Superior Court* (1994) 30 Cal.App.4th 318, 324), the statute applies "whenever an injured party seeks punitive damages for an injury that is directly related to the professional services provided by a health care provider acting in its capacity as such" (*Central Pathology*, *supra*, 3 Cal.4th at pp. 191-192).  Chacon made the alleged misrepresentations to Megan in his capacity as a physician.

Third, cases on what constitutes a professional negligence claim under MICRA are not controlling, because section 425.13 is not part of MICRA, uses different language, and serves a different purpose.  (*Delaney v. Baker* (1999) 20 Cal.4th 23, 39-40; *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 322.)  "The Supreme Court has cautioned repeatedly that 'the scope and meaning of the phrases "arising from professional negligence" and "based on professional negligence" could vary depending upon the legislative history and "the purpose underlying each of the individual statutes." ' "  (*Smith v. Ben Bennett, Inc.* (2005) 133 Cal.App.4th 1507, 1515.)  Thus, for example, a patient's fraud claim against a health care provider *arises out of* professional negligence and is subject to section 425.13 if the misrepresentation or

_____

(1981) 125 Cal.App.3d 623, 635-636 (MICRA limitations period did not apply to claim based on surgeon's concealment of cause of patient's injuries).

13

concealment occurred in the provision of health care services, because this construction serves the statutory purpose of protecting providers from untimely and unsubstantiated claims for punitive damages.  (*Central Pathology*, *supra*, 3 Cal.4th at pp. 188-193; *Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 532-533.)  Such a fraud claim, however, is not *based on* professional negligence and is not subject to the MICRA damages cap (Civ. Code, § 3333.2; *Bigler-Engler*, at pp. 320-323) or statute of limitations (§ 340.5; *Unruh-Haxton v. Regents of University of California* (2008) 162 Cal.App.4th 343, 355-356), because construing MICRA to cover the claim would not serve the statutory purpose of reducing the cost of medical malpractice insurance by limiting the time the patient has to sue the health care provider for malpractice or the amount of damages recoverable (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 111).  We therefore reject the Espinozas' contention that "arising out of" as used in section 425.13 means "based on" as used in MICRA and therefore the scope of the two statutes is "identical."

   b. *Battery*

  The Espinozas' battery count also falls within the scope of section 425.13.  In defining that scope, the Supreme Court of California disapproved a Court of Appeal decision, *Bommareddy v. Superior Court* (1990) 222 Cal.App.3d 1017, that had held the statute did not apply to a patient's battery claim against an ophthalmologist for performing a surgical procedure to which the patient had not consented.  (*Central Pathology*, *supra*, 3 Cal.4th at p. 191).  The Supreme Court stated "a cause of action against a health care provider for battery predicated on treatment exceeding or different from that to which a plaintiff consented is governed by section 425.13 because the injury arose out of the manner in which professional services are provided."

14

(*Central Pathology*, at p. 192.)  In their battery count, the Espinozas allege Megan died as a result of conduct during the augmentation mammoplasty to which she had not consented, namely, administration of anesthesia by Lang and Hernandez outside Chacon's direct supervision and resuscitative efforts undertaken after Megan went into cardiopulmonary arrest.  "The application of anesthetics is obviously an integral part of the surgical treatment which it facilitates" (*Magit*, *supra*, 57 Cal.2d at p. 81), and the resuscitative efforts undertaken after Megan went into cardiopulmonary arrest "were such as a medical practitioner ordinarily would be expected to perform in his or her capacity as a health care provider" (*Palmer*, *supra*, 103 Cal.App.4th at p. 968).  Hence, because the battery count is "predicated on treatment exceeding or different from that to which [Megan] consented" and "the injury arose out of the manner in which professional services [were] provided," the count "is governed by section 425.13." (*Central Pathology*, at p. 192.)

We are not persuaded to reach a different result by any of the many cases the Espinozas cite in their argument the battery count is not within the scope of section 425.13.  *Perry v. Shaw* (2001) 88 Cal.App.4th 658, which held the MICRA cap on damages did not apply to a battery count against a surgeon who performed a procedure to which the patient had not consented, is not on point because, as noted earlier, what qualifies as a professional negligence claim under MICRA is not necessarily the same as what qualifies as a professional negligence claim under section 425.13.  (See pp. 13-14, *ante*.) Cases discussing the elements of a battery claim or the distinction between a battery claim based on lack of informed consent and one based on lack of any consent (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 324; *Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, 1266-1267; *Delia S. v. Torres* (1982) 134 Cal.App.3d 471, 480) are unhelpful

15

because they have nothing to do with section 425.13.  Cases holding a physician owes a fiduciary duty to a patient (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 129; *Cole v. Wolfskill* (1920) 49 Cal.App. 52, 54) or recognizing a distinction between a breach of fiduciary duty claim and professional negligence claim in the context of legal representation (*Mosier v. Southern California Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022, 1044; *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086) are irrelevant because the Espinozas have not asserted a breach of fiduciary duty claim against Chacon and the cases say nothing about section 425.13.  The relevant and controlling case is *Central Pathology*, which makes clear the statute covers the Espinozas' battery claim because the injury (Megan's death) and the cause (unconsented-to treatment) that underlie the claim are "directly related to the manner in which professional services were provided."  (*Central Pathology*, *supra*, 3 Cal.4th at p. 192.)

B.      *Compliance with Section 425.13*

Having determined section 425.13 applies, we next address whether the Espinozas complied with the statute.  Section 425.13 imposes two procedural requirements on a plaintiff who wants to include a claim for punitive damages in a complaint in an action arising out of the professional negligence of a health care provider:  (1) the plaintiff must obtain from the trial court an order allowing the filing of an amended complaint based on an evidentiary showing of "a substantial probability that the plaintiff will prevail on the claim" (§ 425.13, subd. (a)); and (2) the plaintiff must move to amend "within two years after the complaint . . . is filed or not less than nine months before the date the matter is first set for trial, whichever is earlier" (*ibid.*).  Chacon contends the Espinozas' failure to comply with the time requirements required the trial court to deny their motion regardless of the

16

merits of their claim for punitive damages. The Espinozas do not address the time requirements and instead argue they should be allowed to assert their claim for punitive damages because it is not a sham one the statute was designed to screen out before trial. We agree with Chacon.

Whether the Espinozas met the statutory deadline for filing their motion to amend requires application of section 425.13 to undisputed facts and presents a question of law for our de novo review. (*General Atomics v. Superior Court* (2021) 64 Cal.App.5th 987, 993; *Canales v. Wells Fargo Bank, N.A.* (2018) 23 Cal.App.5th 1262, 1269.) The two potential deadlines under section 425.13 were October 21, 2021, which was two years from the date of filing of the initial complaint, and April 28, 2021, which was nine months before the initial trial date. (§ 425.13, subd. (a); see *Brown v. Superior Court* (1990) 224 Cal.App.3d 989, 993 (*Brown*) [nine-month period is calculated from initial trial date, not from date of trial setting conference].) The statute requires the motion to amend be filed before the earlier of the two dates (§ 425.13, subd. (a)), which was April 28, 2021. The Espinozas did not file their motion until August 3, 2021, more than three months late. Section 425.13 provides the trial court "shall not grant a motion" filed after the applicable deadline (*id.*, subd. (a)) and "demands strict adherence to the Legislature's chosen deadline" (*Freedman v. Superior Court* (2008) 166 Cal.App.4th 198, 207 (*Freedman*)). It thus was error for the court to grant the Espinozas' untimely motion, and writ relief is warranted. (*Id.* at p. 201; *Brown*, at p. 994.)

The Espinozas did not respond directly to Chacon's untimeliness argument in their return. When questioned at oral argument about whether this court would have to grant writ relief were it to determine that section 425.13 applies and the Espinozas did not satisfy its time requirements, their

17

counsel suggested the court could deny relief on the basis of the exception to the requirements recognized in *Goodstein v. Superior Court* (1996) 42 Cal.App.4th 1635 (*Goodstein*).  At the court's request, counsel later provided a letter with record citations relevant to application of the exception.  We have reviewed the cited and other portions of the record and determined they do not support application of the *Goodstein* exception.

*Goodstein* "present[ed] an example of a plaintiff who may not, due to circumstances beyond her control, be able to comply with the nine-month time limitation set out in section 425.13." (*Goodstein, supra,* 42 Cal.App.4th at p. 1638.)  Similarly to the underlying case here, the *Goodstein* plaintiff had sued a health care provider for medical malpractice, battery, fraud, and other counts arising out of surgical treatment.  (*Ibid.*)  At a status conference, the court clerk set the trial date less than nine months away.  (*Id.* at p. 1639.)  The plaintiff moved to amend her complaint to seek punitive damages on the battery and fraud counts less than three months before the initial trial date.  (*Id.* at pp. 1639-1640.)  In granting the motion over the health care provider's untimeliness objection, the trial court "appeared to place considerable emphasis on the fact that [the plaintiff] had never had a full nine months to bring her motion following the setting of the trial date." (*Id.* at p. 1640.)  On writ review, the Court of Appeal held a trial court has "inherent power and authority to make an appropriate order to avoid injustice or unfairness" when "a plaintiff, by virtue of the quick trial setting practices of 'fast track' courts, is placed in a position where she cannot reasonably comply with the narrow time limits set out in section 425.13." (*Goodstein*, at p. 1645.)  The *Goodstein* court further ruled:  "Relief from the time limits specified in section 425.13 should be granted only in those situations where a plaintiff has moved with reasonable dispatch and diligence and, through no fault of his or her own, has

18

been placed in a position where compliance with the nine-month time mandate is impossible or reasonably impracticable." (*Goodstein*, at p. 1645.) The Court of Appeal issued a writ directing the trial court to vacate its order granting the plaintiff's motion to amend and to consider five factors the plaintiff would have to establish by a preponderance of the evidence to obtain relief from the statutory time requirements. (*Id.* at pp. 1645-1646.)

*Goodstein* does not apply to this case. The Espinozas "faced none of the obstacles encountered by the *Goodstein* plaintiff. Nothing suggests anyone but the judge presided over the [February 19, 2021] case management conference and set the trial date. The record contains no indication [the Espinozas] objected to the trial date, requested a later trial date, or in any way acknowledged the looming statutory deadline [for filing a section 425.13 motion]. Nor does it point toward anything excusing [their] failure to do so. Moreover, the court set a trial date of [January 28, 2022], giving [the Espinozas] [more than] two full months to file a motion before the nine-month deadline. Unlike *Goodstein*, this is not a case where plaintiff[s] 'through no fault of [their] . . . own, ha[ve] been placed in a position where compliance with the nine-month time mandate is impossible or reasonably impracticable.' " (*Freedman, supra*, 166 Cal.App.4th at p. 205.)

Even if *Goodstein* applied, the Espinozas cannot satisfy its five-factor test, because they cannot show they were "unaware of the facts or evidence necessary to make a proper motion under section 425.13 more than nine months prior to the first assigned trial date." (*Goodstein, supra*, 42 Cal.App.4th at p. 1645; see *id.* at pp. 1645-1646 [plaintiff must satisfy all factors to obtain relief].) From the start of the case, the Espinozas accused Chacon of fraud and battery, intentional torts that may support an award of punitive damages. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 240 [battery]; *Oakes*

19

*v. McCarthy Co.* (1968) 267 Cal.App.2d 231, 263 [fraud].) They alleged he acted with malice, oppression, or fraud in treating Megan, the type of conduct that must be proved to recover punitive damages. (Civ. Code, § 3294, subd. (a); *Silberg v. California Life Ins. Co.* (1974) 11 Cal.3d 452, 462.) The Espinozas had more than 18 months between the complaint filing date (Oct. 21, 2019) and the statutory nine-month deadline (Apr. 28, 2021) to gather the evidence needed to support a motion to amend the complaint to add a punitive damages claim. Although in their motion the Espinozas alleged they had not obtained all the evidence supporting the claim before the nine-month deadline, in part because the COVID-19 pandemic caused delays in scheduling depositions, they admitted they had deposed Chacon on February 10, 2021, and several Divino employees earlier. From the depositions and from medical records produced on January 31, 2020, the Espinozas learned that no anesthesiologist was present during Megan's surgery, and that after she went into cardiopulmonary arrest, Chacon and Lang tried to resuscitate her but did not summon emergency medical assistance for nearly three hours. In their motion, the Espinozas also acknowledged they had evidence before the nine-month deadline that Chacon had misrepresented he was a board-certified plastic surgeon in his curriculum vitae and Internet advertising, and that Divino employees had a practice of evading prospective patients' questions about his board certification. The Espinozas thus had enough evidence to support a punitive damages claim based on their fraud and battery theories before the nine-month deadline had passed. They "could have filed a timely motion" and "simply did not." (*Freedman, supra,* 166 Cal.App.4th at p. 205.)

In another effort to excuse their noncompliance with the statutory time requirements, the Espinozas argue in their return that the trial court's order

20

granting their motion to amend the complaint to add a claim for punitive damages may be upheld because their "lawsuit is a far cry [from] the 'meritless punitive damage[s] claims' . . . section 425.13 was intended to root out," and they satisfied the statutory requirement of showing "a substantial probability that [they] will prevail on the claim" against Chacon based on his own acts and those of Lang and Hernandez on a respondeat superior theory. (§ 425.13, subd. (a).)[5] We need not and do not address this argument, however, because our conclusion the Espinozas did not satisfy the time requirements of the statute makes it unnecessary to do so. "The conduct of which [Chacon] is accused, if true, is unethical, illegal and immoral" (*Davis*, *supra*, 27 Cal.App.4th at p. 629) and would warrant imposition of punitive damages (Civ. Code, § 3294). Section 425.13 nevertheless "demands strict adherence to the Legislature's chosen deadline," "even if doing so does not always advance a fair resolution of the case" (*Freedman, supra*, 166 Cal.App.4th at p. 207), and "mandates an untimely motion 'shall not be granted' " (*Brown, supra*, 224 Cal.App.3d at p. 994).

C.      *Waiver of Compliance*

We finally resolve the parties' dispute over whether Chacon waived the right to demand compliance with section 425.13 by failing to attack the

---

[5]      In support of this argument, the Espinozas request judicial notice of documents from other proceedings arising out of Megan's death, including an accusation of the Medical Board of California against Chacon and a felony complaint and other papers from a criminal proceeding against Chacon and Lang. The Espinozas contend the documents are judicially noticeable as official government records and are relevant because they show Chacon and Lang engaged in unlawful conduct warranting imposition of punitive damages. (See Evid. Code, §§ 452, subds. (c), (d), 459, subd. (a).) We deny the request because, as explained in the text, the documents "are not relevant to our disposition of this matter." (*St. Croix v. Superior Court* (2014) 228 Cal.App.4th 434, 447.)

allegations of fraud, oppression, and malice included in the Espinozas'
original and first amended complaints.  The Espinozas contend Chacon's
litigation of the underlying action for nearly two years before challenging
those allegations constituted a waiver.  Chacon insists there was no waiver
because the Espinozas never mentioned punitive damages in those pleadings.
Because the pertinent facts are undisputed, we review the trial court's
decision on waiver de novo and conclude there was none.  (*St. Agnes Medical
Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196; *Oakland
Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th
1175, 1191.)

A waiver occurs when a party intentionally relinquishes a known right
(*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475) or loses a right
by failure to perform an act required to preserve it (*Platt Pacific, Inc. v.
Andelson* (1993) 6 Cal.4th 307, 315).[6]  The right at issue here is that of a
defendant health care provider in an action arising out of professional
negligence not to have "a *claim* for punitive damages" included in the
complaint unless the plaintiff first makes the motion and obtains the order
required by statute.  (§ 425.13, subd. (a), italics added.)  These procedural
requirements are "not jurisdictional, and absent timely objection to a
complaint's inclusion of a punitive damages *claim* without court permission,
the protection conferred by section 425.13 is waived."  (*Vallbona v. Springer*
(1996) 43 Cal.App.4th 1525, 1535 (*Vallbona*), italics added.)

The trial court in this case erroneously relied on *Vallbona, supra*, 43
Cal.App.4th 1525, to find waiver.  In *Vallbona*, the plaintiffs filed a complaint

_____

[6]     The latter type of waiver is more precisely called forfeiture, but cases
and statutes do not always distinguish the two types.  (*Quigley v. Garden
Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 805, fn. 4; *In re S.B.* (2004)
32 Cal.4th 1287, 1293, fn. 2.)  We use waiver in the broader sense here.

22

against the defendants "containing *claims* for punitive damages" without court permission, and the defendants did not challenge the pleading until the outset of trial by motion in limine. (*Id.* at pp. 1533-1534, italics added.) We held that "by not earlier raising the issue of section 425.13, defendants waived any rights they might have had under that statute." (*Vallbona*, at p. 1534.) Unlike the complaint in *Vallbona*, the Espinozas' initial and first amended complaints contained *allegations* of "malice, oppression, and/or fraud" that might support a claim for punitive damages (see Civ. Code, § 3294, subd. (a) [authorizing punitive damages when "defendant has been guilty of oppression, fraud, or malice"]), but no *claim* for such damages. A "claim" is "[a] demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for." (Black's Law Dict. (11th ed. 2019) p. 311; see *Westrec Marina Management, Inc. v. Arrowood Indemnity Co.* (2008) 163 Cal.App.4th 1387, 1393 [claim is " 'a demand for something as a right, or as due' "]; *Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.* (1976) 64 Cal.App.3d 261, 269 ["A 'claim' has been defined in ordinary English as 'a demand for something due or believed to be due' "].) Because the Espinozas did not demand or even mention punitive damages anywhere in their initial or first amended complaint,[7] the inclusion of allegations of malice, oppression, and fraud in those pleadings did not violate the statutory prohibition against including a "*claim* for punitive damages" (§ 425.13, subd. (a), italics added), and Chacon therefore had no right to attack either pleading under the statute. By waiting to assert the right to demand

---

[7] The Espinozas could not include an amount of punitive damages in their pleadings (§ 425.10, subd. (b)), but could have notified Chacon of the amount they were seeking in response to his request for a statement of damages (§ 425.11, subd. (b)). They did not.

compliance with section 425.13 until the Espinozas actually sought to assert a punitive damages claim by their motion to file a second amended complaint, Chacon did not waive that right. (See *People v. Figueroa* (2017) 11 Cal.App.5th 665, 684 [defendant could not waive right that had not yet accrued]; *Jones v. Maria* (1920) 48 Cal.App. 171, 173 [person in position to assert right may waive it by conduct].)

## III.

## DISPOSITION

Let a writ issue commanding respondent, immediately upon receipt of the writ, to vacate its October 4, 2021 order to the extent it granted the motion of real parties in interest leave to amend their complaint to add a claim for punitive damages against petitioners and to enter a new and different order denying the motion to that extent. Petitioners are awarded their costs of this writ proceeding.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DO, J.

24